STEARNS & CULVER LUMBER COMPANY, *Plaintiff in Error*,
v. MARY A. CAWTHON, *et al., Defendants in Error*.

1.  In an action of trespass to recover damages for trespasses
    alleged to have been committed by the defendant on lands
    of the plaintiffs, and where it becomes necessary to deter-
    mine whether the trespass was a wilful one authorizing
    punitive damages, the jury should not be left, by an instruc-
    tion of the court, to determine what the law requires of a
    party in ascertaining the boundary line between his own
    lands and those of adjoining proprietors.

2.  A negligent trespass is not necessarily a wilful one for the
    negligence may be so slight as not to show a want of *bona
    fides*, but when a party makes no effort whatever to ascer-
    the boundary between his own lands and those of adjoining
    owners, when sued by the latter for trespasses committed, he
    cannot. claim that he acted unintentionally or by mistake.

3.  Instructions of doubtful propriety are harmless where there
    is no doubt of the propriety of the verdict.

This case was decided by Division B.

Writ of error to the Circuit Court for Walton County.

The facts in the case are stated in the opinion of the
court.

*Blount & Blount & Carter,* for Plaintiff in Error;

*Daniel Campbell & Son,* for Defendants in Error.

HOCKER, J.—The defendants in error, in May, 1910,
sued the plaintiff in error in the Circuit Court of Walton
County. The declaration contains six counts in tort, to
each of which the plea of not guilty was filed. The first
count is as follows: "That the defendant, before the

institution of this suit, wilfully and maliciously broke and entered certain lands of the plaintiffs known and described as follows: The NE¼ of SW¼ and NW¼ of NE¼, Section 18, Township 5 North, Range 21 West, in Walton County, Florida, and cut and boxed, felled and removed the timber and trees therefrom, cutting, felling and destroying the growing trees, timber and other growth thereon, to the great damage of the said lands, and to the damage of the plaintiffs in the sum of $5,000."

The second count is like the first, except that it omits the allegation that the trespass was "wilfully and maliciously" committed. The third alleges that the defendant wilfully and maliciously broke and entered the described lands of the plaintiffs and cut down and removed therefrom 400 pine trees of the value of $7.50 each, aggregating $3,000. The fourth alleges the wilful and malicious breaking and entering the same lands and the cutting and removal of 1,000 pine saw logs aggregating 200,000 feet of the value of $15.00 per thousand. The fifth alleges the wilful and malicious breaking and entering the same lands and extracting the turpentine and rosin from the pine trees thereon of the value of $916.00. The sixth count is as follows:

"And the plaintiffs further sue the defendant, for that the defendant, before the commencement of this suit, converted to its own use the following property of the plaintiffs, to-wit: 960 gallons of spirits of turpentine of the value of 58c per gallon, of the aggregate value of $554.80, 80 barrels of rosin of the value of $4.50 per barrel, of the aggregate value of $360.00, and also 200,000 feet of pine lumber manufactured from the pine saw logs, and wilfully and maliciously removed from plaintiffs' property the said lumber, being of the value of $15.00 per thousand feet, of the aggregate value of $3,000.00, and also 88 cross-

ties cut from the timber on plaintiffs' property, of the value of 15c each, of the aggregate value of $37.60, and wilfully and maliciously removed the same."

The damage are fixed at $5,000.00. The case was tried on the plea of not guilty to each of these counts resulting in a verdict for $1,100, and a judgment for the same, including costs of $128.06. The judgment is here for review on writ of error.

There are three assignments of error: Two based on instructions given at request of the plaintiffs below, and the third on the action of the court overruling the motion for a new trial. There was no objection in the court below if one could properly have been made to the joinder in the declaration of counts for trespass and trover and conversation, or conversion, and the case was tried on the issues thus made. It is stated in the brief of the plaintiff in error that it admitted liability at the trial, and the only question at issue related to the amount of damages. The plaintiff in error also refers in his to the rules laid down in Wright v. Skinner, 34 Fla. 453, 16 South Rep. 335, for the ascertainment of damages against a wilful trespasser, and against an unintentional or mistaken trespasser, as affording guiding principles in this case.

The instruction complained of in the second assignment is as follows: "The law makes it incumbent upon parties who have adjoining lands to ascertain in the manner provided by law the lines dividing their possessions or property, and if one negligently and without taking the precaution that the law requires enters upon the lands of another and commits a trespass, this in the eyes of the law would be wilful."

The objections to this instruction in the brief of plaintiff in error, are, first, that it "does not define what acts

the law requires of the owner to ascertain the correct dividing line, nor what acts of precaution the law required to relieve him from the imputation of having wilfully entered upon his neighbor's lands. In other words the jury was told that the law regulated these things, but did not inform it what those regulations were. It was left with the jury to say what precautions were required to be taken, and what manner the law provided for ascertaining the land lines. Neither of these things are provided for by any hard and fast rules of law, so far as we are advised."

The second objection to this instruction is that it had a tendency to impress the jury with the idea that a mere negligent entry and trespass would as a matter of law impose the liability which the law affixes to a *wilful* trespass. It is contended that in the case of Wright v. Skinner, *supra*, this court uses the phrase *"wilful* trespasser" in contradistinction to the phrase "unintentional or mistaken trespasser," and it is contended that a mere negligent trespass is not necessarily a wilful one. The defendants in error in their brief, cite no authority which supports the first part of this instruction. Some authorities are referred to as holding that ordinary care should be used in ascertaining boundary lines, and that where a trespass is committed without using *ordinary* care in ascertaining boundaries that would constitute a wilful trespass. It seems to us this objection is well taken. The jury should not have been left to determine what the law requires of a party in ascertaining a boundary line. Under our system the jury pass on the facts of a case, not the law applicable thereto. That a negligent trespass is not necessarily a *wilful* one is shown in the case of Trustees of Dartmouth College v. International Paper Co., 132 Fed. Rep. 92-98-99.

The other instruction complained of is as follows: "If you believe from the evidence that the defendant entered upon the lands of the plaintiff by its employees and servants and carelessly and without regard to the rights of the plaintiff, you will assess the damages if you find property was removed, at the market value of the property at the time of such removal."

It seems to us that the meaning of this instruction was somewhat obscure and not calculated to enlighten the jury upon the difference between an "unintentional and innocently mistaken act of trespass," and a "wilful" one. No authority is cited by defendants in error in support of this instruction.

The contention seems to be made by the defendants in error that the instructions we have considered, if erroneous were under the facts of the case harmless—in other words, that the jury as reasonable men could not from the evidence have found the trespass to be anything than wilful, and a verdict for a less amount could not reasonably have been found. This involves a consideration of the evidence. To sustain the contention of the defendants in error, the testimony of Mr. Cummings and Mr. Paul is relied on. Mr. Paul was a witness for the plaintiffs and testified in substance that he had lived near the lands in question about six years; that he knew where the lands of the Cawthon heirs were; that he worked for the defendants and hauled logs from the land of the Cawthon heirs about three years before he testified and delivered them to the Stearns and Culver railway; that Mr. Cummings put him there to hauling; that he had a conversation with Mr. Cummings about the lands; that Cummings told him to cut the timber as far as it was boxed; that Cummings said he supposed the boxes were all right or they would not be cut; that if they were not

right they ought to have the line open; that witness told Cummings he ought to be right about it; that this is the Cawthons' land, and the Cawthon boys were mighty particular—that Stearns and Culver were cutting timber all around there.

Mr. Cummings testified in substance that he was employed by the defendants about six years, but left them the 1st of October last year (1909) ; that he knew Jack Paul, and put him to cutting the timber off the lands in this vicinity two or three years ago; that he told him not to go out of the boxed timber into the round timber; that he remembered nothing of any conversation with Paul about the Cawthons' lands; that at this time defendant was working the NE¼ of the SW¼ for turpentine purposes; that he had at that time supervision of the defendant's logging, but not of the timber business; that when he directed the cutting of the timber he supposed that the round timber around there belonged to the Cawthons— the round timber on the land we were cutting on; that at that time he believed the boxed timber we were cutting belonged to the defendant—that the round timber adjoined the boxed timber; that defendant had been working that timber for turpentine purposes about four years, and the turpentine portion extended all around North and West, and right up to it; that he didn't know until he found out the line by tracing it sometime in January; that he then wired Mr. Graham, the manager of the defendant, and cut no more after that; that he did not remember that either Mr. S. K. Miller or Mr. Walter Cawthon told him anything about the defendant's working upon the Cawthon land; that he saw Mr. Miller (plaintiff's witness) about two days after he found out the mistake; that he never had a message to go and see him about the supposed trespass; that he just spoke to Mr.

Miller when he saw him and said we had gotten over on their land; that he didn't remember any other conversation with Mr. Miller, except he said he saw our foreman and told him we had cut 500 logs; that nothing was said about leaving the logs until they were scaled; didn't cut any more logs on that land after this time; that "we" hauled the logs after we found out about the trespass; that witness said we might as well take the logs, "we were in it anyway; we would have to pay for them, so we hauled the logs away;" that it was supposed to be a part of his business to check up the lines and found out the mistake in checking up the lines. This witness further stated that he had a fairly good knowledge of where the lines were; that he knew how the lines ran, and that the land East of Pone Creek was the Cawthon land, and that defendant had not leased it; that he took the boxes all to be on defendant's lands; that he knew there are no triangular surveys in Government surveys. (The relevancy of this statement of the witness is apparent from the fact that the evidence shows without dispute, that the trespassers on this land in cutting and boxing timber ran triangularly through the land, with the line of Pone Creek, and that the round timber spoken of by the witness as the Cawthon land was on the other part of the land described in the declaration, viz: East of Pone Creek. Pone Creek ran diagonally through the land). This witness further said he considered Pone Creek to be the line; that when he checked up the lands he did not have Mr. Allen (a surveyor) do the surveying; that he "had sufficient knowledge of the lines himself to go and find them."

Lee Thompson, a witness for defendant, stated that he was foreman for Mr. Cummings in defendant's logging operations in January, had been employed for three years; got his instructions from Mr. Cummings to cut

these logs; supposed the timber belonged to defendants; had no knowledge it was Cawthon's; that the creek did not lie straight North and South; part did and another part did not; that the boxes followed the creek; that the lands immediately East of the creek belonged to the Cawthons; that he did not consider the stream of water running Northeasterly to Southwesterly was the dividing line between Stearns and Culver and the Cawthons' lines.

Mr. H. E. Graham testified for the defendant that he is manager for defendant; was such in January, 1910; that at the times the logs were cut on the lands in controversy he was manager, and had no suggestion or idea that the logs were not defendant's; the first intimation was telegrams and correspondence with one of the Cawthons—probably 6th, or 7th of January; that as soon as he had this intimation he had Mr. Allen, a surveyor, run the lines to ascertain if there had been a trespass.

There is uncontradicted testimony given by Mr. Burleson, a witness for the plaintiffs, that he assisted Mr. Allen, the surveyor, for the defendant, in running and marking the section lines around this property about three years before he testified (1910).

The foregoing is the substance of all the evidence relating to the question whether the trespass of the defendant was a "wilful one," or wheher it was an "unintentional or mistaken" trespass, the words used to denote the two kinds of trespass in Wright v. Skinner *Supra*.

It does not appear from the evidence that the defendant ever took any precautions whatever to ascertain the line between its land and plaintiff's until after the land had been turpentined for four years, and the trees had been cut down. It appears affirmatively that the logs were removed from the land without the consent of plaintiffs, after they were cut down. Mr. Cummings says he had a

fairly good knowledge of the land lines, and yet he says he supposed the lands trespassed belonged to defendant. He knew that the line of trespassing ran diagonally across the land, and knew there were no diagonal lines in the Government Survey, and that the lands East of the creek in the same quarter-quarter section belonged to the Cawthons. Moreover, the defendant's agents were informed nearly three years before the suit was brought that it was trespassing on the lands of plaintiff and they removed the logs they had cut on the land after a survey had shown them that defendant was a trespasser. Under this condition of the testimony it seems to us that the jury could not have reasonably found that the defendant was an unintentional or mistaken trespasser. The defendant's conduct in trespassing was reckless in the sense that it showed neglect and indifference to plaintiffs' rights.

In the case of Ripy v. Less, .... Tex. Civ. App. ......, 118 S. W. Rep. 1084, the court says: "Every person who cuts timber upon his own land, or who intends to do so, owes a duty to an adjoining landowner to ascertain the boundary line of the adjoining land if he can with diligence and care, so as to avoid trespassing upon such adjoining land; and if he neglects such duty and negligently and carelssly or recklessly cuts beyond his own premises he can not be said to have done so by mistake. The neglect of such duty is in itself evidence of a want of good faith." The court then proceeds to apply to larger damage rule laid down in Bolles Woodenware Co. v. United States, 106 U. S. 432, 1 Sup. Ct. Rep. 398, and which is adopted by this court in Wright v. Skinner, *supra*.

In the case of Brown v. Bosworth, 58 Wis. 379, 17 N. W. Rep. 241, it was held that if a person cuts timber upon his

own land, and while so doing carelessly and heedlessly cuts across the line of his neighbor's land, such careless-ness is a neglect of his duty, and is evidence of a want of good faith on his part, and he cannot invoke such careless and heedless act as a mistake.

It is said in Trustees of Dartmouth College v. Interna-tional Paper Co., 132 Fed. Rep. pp. 92-99, that "if the injury is caused by negligence, as distinguished from wil-fulness, wantonness or recklessness, it seems that the de-fendant is still entitled to his allowance" (the lesser de-gree of damages). We do not think the undisputed facts of this case bring it within the scope of this decision. Un-doubtedly negligence might be of such a slight degree as not necessarily to show a want of *bona fides* in the tres-passer. But in the instant case the negligence was as gross as it could well be. Not the slightest effort was made by the defendant to ascertain the boundary between its land and plaintiffs' and trespassing was continued after it was informed of the trespassing. It is held in Mackey v. Fullerton, 7 Colo. 556, 4 Pac. Rep. 1198, that "wilful ignorance is equivalent in law to actual knowl-edge. He who abstains from inquiry when inquiry ought to be made can not be heard to say so and rely upon his ignorance." Kerr on Fraud and Mistake, pp. 237-238. While the two instructions discussed were perhaps not proper statements of the law, under the evidence they were harmless. Goff v. State, 60 Fla. 13, 53 So. Rep. 327.

The only other assignment to be considered attacks the verdict as excessive. In examining the question we must keep in mind the issues made by the pleadings. The first five counts sued for damages to the land in cutting, felling and destroying the growing trees, timber and growth thereon, alleging the removal of 400 pine trees of the

value of $7.50 each, 1,000 pine saw logs aggregating 200,-000 feet of the value of $15.00 per thousand; also alleging the extraction of turpentine and rosin of the value of $916.00. The sixth count alleges the conversion of 960 gallons of spirits of turpentine of the value of 58 cents per gallon; 80 barrels of rosin of the value of $4.50 per barrel; of 200,000 feet of lumber of the value of $15.00 per thousand feet, and of 88 cross-ties of the value of 15 cents each. The damages were put at $5,000.00. The general issue and no other plea was filed to the various counts. The defendant admitted the trespasses complained of, and only disputed the damages. There was a conflict in the testimony estimating the number of trees cut, the number of saw logs made from the trees, and the quantity of lumber which they would yield. There was also a conflict as to the dip and scrape, and the number of gallons of turpentine. There was scarcely any definite testimony on these points. Estimates were made by the witnesses from their supposed knowledge of the turpentining and logging business. The number of trees cut for saw logs varied from about 312 to over 400. The number of said logs to the tree varied from one and a half to two or more. some of the trees were said to be sixty feet long, capable of making three saw logs of the length of twenty feet. The methods of estimating the diameter of the logs differed somewhat in the application of Doyle's Rule for estimating the lumber in a log.

Mr. Mortgomery Allen, a witness for the defendant, testified as we understand his testimony that 392 trees were cut averaging 146 feet. But it is evident that he did measure by Doyle's rule, as we understand it. He says if he got a tree 58 feet from the top of the butt he would take the diameter at the small end and run back and call it that for 58 feet, and make no deduction for short logs

cut out of the trees. He says he found some trees 60 feet long, and if the diameter at the small end was 9 inches, the whole log was considered 9 inches in diameter, though it might have cut into three saw logs. This, as we have said, is not Doyle's rule as we understand it. Doyle's rule in measuring logs (saw logs), is to take the diameter in the middle of the log inside the bark. This is obtained by taking the diameter at *each end* of the log, adding them together and dividing by 2. (See page 71 Scribner's Lumber and Log Book, put in evidence by defendant).

Another witness (Mr. Wilkins) stated the logs ran from 9 to 18 inches in diameter. Mr. McCall, a witness for plaintiff, stated he was a timber estimator and was familiar with the market value of logs. He says the market value of timber in January and February, 1910 (when the logs were removed from the land), ran from $10.00 to $25.00 per thousand, averaging about $14.00. Mr. S. K. Miller, a witness for the plaintiff, says he and Allen counted 400 stumps. He didn't agree with Mr. Allen in estimating the lumber. He cut the trees up into merchantable lengths. For instance, a 60-foot tree he divided into four logs of 15 feet, and endeavored to ascertain the lumber in each log. He made out over 1,300 logs contain- ing 175,000 superficial feet of lumber. It is evident, how ever, that his multiplication is wrong. It is also evident that there were a great many more saw logs than were allowed by Mr. Allen. There were probably as many as 600 saw logs running from 24 to 36 feet in length, and from 8 to 18 inches in diameter. From Doyle's rule the jury might have estimated the timber at 150 feet to the log or 90,000 feet. The value of the lumber was given by witnesses as from $5.00 to $14.00 per thousand. If we place it at $9.00 per thousand the value would be $810.00. The only witness who testified as to the probable value of

the dippings, scrape and turpentine, was Mr. R. H. Adams, a turpentine operator. From this testimony the jury might have concluded that the turpentine manufactured from the dippings and scrape was worth $300.00. Taking no account of the damage to land they might have found that the value of the timber and turpentine was $1,100.00, the amount of the verdict. Of course if we simply regard the value of the twenty acres of land with the trees on it, this might seem excessive; but in a case of this kind, this is not the correct view of the measure of damages.

We find no reversible error in this record, and the judgment below is affirmed.

TAYLOR and PARKHILL, J. J., concur.

WHITFIELD, C. J., and SHACKLEFORD and COCKRELL, J. J. concur in the opinion.